## WERNIMONT *v.* STATE *ex rel.* LITTLE ROCK BAR ASSOCIATION.

## Opinion delivered December 11, 1911.

1.  ATTORNEY AND CLIENT—NATURE OF DISBARMENT PROCEEDING.—Proceedings for the suspension or disbarment of attorneys for professional misconduct are civil, and not criminal in their nature.   (Page 216.)

2.  SAME—LICENSE—REVOCATION.—An attorney's license to practice law is a privilege which may be revoked whenever his misconduct unfits him to exercise the duties of his office.   (Page 216.)

3.  SAME—DISBARMENT PROCEEDING—RIGHT TO JURY TRIAL.—Under Kirby's Digest, section 460, a defendant in a disbarment proceeding is entitled to a jury trial; but he is deprived of no right of which he can complain where the case is tried by the court without a jury when the evidence adduced upon the trial is uncontroverted.   (Page 217.)

4.  SAME—NATURE OF DISBARMENT PROCEEDINGS—PARTIES.—Disbarment proceedings are informal, and the prosecution may be conducted in the name of the State by its prosecuting officer or the court may require a member of the bar to present and prosecute the charges, and the court may proceed according to the rules of practice adopted by it, not contrary to the procedure prescribed by statute.   (Page 217.)

5.  SAME—JURISDICTION TO DISBAR.—The power to disbar an attorney is inherent in all courts having authority to admit attorneys to practice, and is indispensable to protect the courts and the public, as well as to maintain the honor of the profession.   (Page 218.)

6.  SAME—WHEN ATTORNEY DISBARRED.—The power to disbar an attorney should be exercised with caution, and only for reasons which would render his continuance in practice inimical to the just and proper administration of justice or subversive of the integrity and honor of the profession.   (Page 218.)

7.  SAME—WHEN ATTORNEY DISBARRED.—An attorney may be disbarred for malpractice and dishonesty in his profession, as where he deceives the court or abuses its process to obtain an unjust result. (Page 218.)

8.  SAME—DISBARMENT—MALPRACTICE.—Unprofessional misconduct for which an attorney may be disbarred may consist in betraying the confidence of a client, in attempting by any means to practice a fraud, impose upon or deceive the court, the adverse party or his counsel, in tampering with or suborning witnesses, fraudulently inducing them to absent themselves or avoid attendance upon the court, or any other conduct tending to bring reproach upon the legal profession. (Page 219.)

9.  SAME—WHEN ATTORNEY DISBARRED.—Where defendant, a practicing attorney, bought a large number of small notes executed to an insolvent insurance company by persons residing throughout the State, and for a pretended consideration procured a person residing in the county

to guaranty all of the notes in order that the local court might have colorable jurisdiction of the nonresident defendants jointly sued with such guarantor, such conduct amounted to such a fraud upon the court as would justify his disbarment.  (Page 219.)

Appeal from Pulaski Circuit Court, Second Division; *F. Guy Fulk*, Judge;  affirmed.

### STATEMENT BY THE COURT.

This is an appeal prosecuted by Henry G. Wernimont from a judgment of the Pulaski Circuit Court revoking his license to practice law in that court, and striking his name from the roll of its attorneys.  The proceeding was begun by a written motion filed by a number of attorneys practicing in that court, representing the Grievance Committee of the Little Rock Bar Association, and also by the Prosecuting Attorney of the Sixth Judicial Circuit on behalf of the State, in which it was charged that said Wernimont had been "guilty of misdemeanor in his professional capacity, and of unprofessional conduct as an attorney, so as to render him unworthy and unfit to be a member of the profession."  Notice of the filing of the motion was duly served upon the defendant, and he thereupon appeared and interposed a demurrer thereto, which was overruled.  He then made answer, duly sworn to, in which he set forth in detail his actions in the matter of the charges made against him.  His deposition was also taken in his behalf, in which he reiterated the truthfulness of the statements made in said answer.  The defendant did not appear in person at the trial of the case, but was represented by an attorney whom he employed to defend against the charges.  At the request of the attorney for the defendant, a jury was impaneled, but subsequently the court discharged the jury, over the objection of defendant's attorney, and proceeded to pass upon and try the case "upon the petition, answer and deposition, with the exhibits thereto, and upon the matters known to the court as appearing upon the records of the court."  The court found that the defendant was guilty of misdemeanor in his professional capacity, and of malpractice as an attorney in perverting and abusing the process of the court;  and it thereupon ordered his name stricken from its roll of attorneys, and entered judgment disbarring him from practicing in that court.

It appears from the statements set out in the sworn answer

of the defendant that he was the president of a corporation known as the "German Investment Company," engaged "in buying and selling promissory notes and choses in action as agent and broker, and the buying and acquisition of such for investment, profit and gain." The other corporators were members of defendant's family, and he entered into a contract with the company whereby "all law and collection business transacted by him was the business, property and acts" of the company.

It appears that two mutual fire insurance companies operating in the State had, by insolvency proceedings, been placed in the hands of receivers. Amongst the assets of these insurance companies were a large number of notes, aggregating in face value about $15,000. These notes were in small amounts of from five to twenty dollars, and were executed by persons who resided in various counties throughout the State. One of these insolvent companies, known as the Home Insurance Company, possessed about five hundred of these notes, of the face value of from five to six thousand dollars, which were advertised for sale by its receiver. At that sale the defendant, as president of the German Investment Company, bid therefor the sum of $50, which was accepted by the receiver. Defendant stated that at that time he had no person in view for whose account to purchase said notes until a few days later, when he mentioned the matter to one D. R. Miller, who importuned him to make the purchase for his account, to which he assented.

At defendant's request, the receiver made a bill of sale for the notes to said Miller, who gave his check for $50 therefor. Thereupon said Miller took all these notes to the office of the German Investment Company and proposed to sell the same to it in bulk. The defendant, representing the Investment Company, then entered into a written contract with said Miller, whereby it was agreed that Miller should indorse and guaranty the payment of all these notes, and that he would acquire other notes offered for sale by the receiver of the other insolvent insurance company above mentioned, known as the American Insurance Company, and likewise indorse them to the German Investment Company and guaranty their payment. Later, these notes were secured by Miller for a small sum, and indorsed to the German Investment Company. The notes of this latter

insurance company were also small in amounts, but large in number, and were of the face value of from seven to eight thousand dollars, and the persons executing the same resided in various counties throughout the State.

The defendant stated that the German Investment Company paid to Miller $401.31 for the notes of the Home Insurance Company and $382.43 for those of the American Insurance Company, and further agreed to pay Miller 20 per cent of all these notes when collected, with the understanding, however, that if any were not collected, and the face of such uncollected notes thus guaranteed by Miller exceeded the twenty per cent of the notes collected, then Miller should receive nothing further from the German Investment Company, but on the other hand should pay to it the amount of such excess. It was also agreed that Miller should undertake the collection of all said notes for a commission of 25 per cent. of the collections made.

It was further stated by the defendant in his answer that the purpose of making this contract with Miller, under the terms of which he indorsed and guarantied the payment of these notes, was to secure a guarantor who resided in Pulaski County, so that jurisdiction could be acquired, in suits instituted in that county, over his person, and thereby, under the statutes of the State, to acquire jurisdiction over the persons of the makers of the various notes, who were nonresidents of Pulaski County, and who resided in various counties throughout the State.

Thereupon, separate suits were instituted on several hundred of these notes by the defendant in the name of the German Investment Company as plaintiff, and against said Miller and each of the makers thereof, before a justice of the peace of Pulaski County. Miller acknowledged service of summons in each of the suits, and process was issued in each of the suits against the makers of the notes, who were nonresidents of said Pulaski County, but who resided in counties throughout the State, some of them distant from Pulaski County. A large number of these suits proceeded to judgment before said justice of the peace. In some of the cases, the makers of the notes appeared and charged that the alleged transfer and guaranty of the notes by Miller to the German Investment Company was only a sham and a fraud, in order to secure jurisdiction

over them, although they resided in counties distant from
Pulaski County, and asked that the service of summons upon
them for that reason should be quashed. But this was never
done in the justice of the peace court.

A great number of appeals were taken from these judg-
ments rendered by this justice of the peace on these notes to
the circuit court of Pulaski County. In that court the motion
to quash the service of summons on the defendants who were
nonresidents of Pulaski was renewed; but in most cases, before
the same could be heard by the court, the defendant, represent-
ing the German Investment Company as plaintiff in those
cases, dismissed them, and before the trial of any of the cases
took nonsuits.

The defendant says that he instituted at least 242 suits on
these notes, about 180 of which were reduced to judgments.
A great many of these suits were appealed to the Pulaski Cir-
cuit Court, where in some cases the service of summons was
quashed, and in a great number of other cases the defendant,
representing the German Investment Company, took these
nonsuits.

We do not deem it necessary to set out further the state-
ments which were made by the defendant in his sworn answer
relative to his actions in securing these notes and instituting
these suits thereon. From a careful examination thereof, we
think the lower court was well warranted in finding that Werni-
mont conceived the plan of having these notes transferred by
the receivers to Miller, a resident of Pulsaki County, in order
that he might indorse them to the German Investment Company
for the sole purpose of giving it, under the forms of law, an
apparent right to institute suits in Pulaski County against said
Miller and the numerous persons who were nonresidents of
said county, and thus to use the process of the court in obtain-
ing jurisdiction of such persons, in apparent conformity with
law, when as a matter of fact the guarantying indorser on
these notes, instead of being an adversary in such suits, was in-
terested in their prosecution, and that he was thus made a
defendant in the suits only in order to reach with process these
other persons, nonresidents of the county wherein the suits
were instituted, and not in good faith; and further, that the
result and purpose of these operations was to force from these

defendants, who resided at a distance from the forum where the suits were instituted, a compromise or payment of these claims in order to escape the great expense of making defense of these suits at such a great distance from their residence.

*W. T. Tucker*, for appellant.

1. The charge against appellant not being an indictable offense, he was entitled to a jury. Kirby's Digest, § 460.

2. There is nothing in the record to show that it was not a *bona fide* transaction by which Miller purchased the notes. It will be presumed that the transaction was in good faith and not fraudulent, because, Miller being a resident of the county, appellee, having the right as well as the opportunity to call upon him to testify, did not do so. Kirby's Digest, § 6164; 32 Ark. 338; Moore on Facts, § § 563-586.

3. An indorser or assigner is equally liable with the original maker. Kirby's Digest, § 522. And the maker can not question the consideration of the assignment. *Id.* § 518; 26 Ark. 660; 33 Ark. 531.

While it is true that the maker and the indorser are severally liable, yet it is optional with the plaintiff whether he will sue one or both. Kirby's Digest, § 6009. Plaintiff, having exercised the right to sue both, and one of the parties being a resident of Pulaski County, and the other in each case a resident of some other county in the State, was authorized by law to institute the suits in Pulaski County. Kirby's Digest, § 4558.

4. If the acts of appellant had been illegal, yet that would not justify his disbarment, in the absence of a showing of bad or fraudulent motive on his part. 18 L. R. A. 401.

*R. L. Rogers*, Prosecuting Attorney, and *Cockrill & Armistead*, for appellee.

1. Appellant's scheme with Miller was a palpable fraud, justifying his disbarment. Their acts constitute an abuse of process, which not only renders the process and judgment of the court rendered thereon void, but also constitutes a fraud on the courts and a perversion of its process.

While it is true that the law permits summons to issue to any constable in the county of other defendants where a joint defendant resident in another county is there sued, yet this

means a real resident defendant, and not a *sham* defendant set up for that purpose. "Defendant" means any person who has or claims an interest in the controversy *adverse* to the plaintiff. 72 Ark. 322; 8 Tex. 122; 26 Tex. 700; 47 Mo. 333; 50 N. H. 484; 3 N. H. 130; 3 Wend. (N. Y.) 261; 25 *Id.* 411; 4 Dallas (U. S.) 330; 18 How. (U. S.) 77; 41 Mich. 552; 7 Ia. 465.

The wrongful act of an attorney for which he may be disbarred must be wilfully done, but it is not necessary that it be corruptly done. Weeks on Attorneys, 165, § 80. Here the act itself and the confessed purpose of the doer disclose a bad motive. See also 73 Atl. 303; 5 Page, 311.

2. The court held as a matter of law on the answer of the defendant that he was guilty. There was, therefore, nothing for a jury to pass upon. The judgment, however, was a proper exercise of the inherent power of the court to disbar and strike from the roll an offending attorney, and, viewed from this standpoint, a jury could not of right be demanded, and the court need never have impaneled one. 3 Am. & Eng. Enc. of L. (2 ed.) 300-302; 4 Cyc. 906; Weeks on Attorneys, 380; *Id.* 170, § 81; 22 Ark. 149; 19 How. 9; 28 Ch. Div. 614; 7 Col. 237; 1 How. 303; 6 Baxt. (Tenn.) 337; 1 Yerg. (Tenn.) 230; 107 U. S. 265; 168 Mass. 169; 87 Mo. App. 542; 73 Kan. 743; 32 Ore. 421; *Id.* 538; 38 C. L. J. 411.

FRAUENTHAL, J., (after stating the facts.) It is urged by counsel for the defendant that he was entitled to have a jury pass upon the charges made against him, and that the court erred in discharging the jury and proceeding with the trial.

Proceedings for the suspension or disbarment of attorneys for professional misconduct are not criminal, but civil in their nature. They are not instituted or intended for the purpose of punishment. Their object is to preserve the purity of the courts and the proper and honest administration of the law. Attorneys are officers of the court, made so by its order when they are admitted to practice therein. The purpose of the proceedings for suspension and disbarment is to protect the court and the public from attorneys who, disregarding their oath of office, pervert and abuse those privileges which they have obtained by the high office they have secured from the court. The right to practice law is not an absolute right, but a privilege only. It is but a license which the court grants by its judgment of

admission to the bar, and which the same court may revoke whenever misconduct renders the attorney holding such license unfit to be entrusted with the powers and duties of his office. The revocation of such license is therefore only a civil proceeding, governed by the rules applicable to all civil actions. Weeks on Attorneys at Law, § 80; *Randall* v. *Brigham*, 7 Wall. 523; Ex parte *Wall*, 107 U. S. 265; *Turner* v. *Commonwealth*, 2 Metc. (Ky.) 619; *State* v. *Harber*, 129 Mo. 271; Ex parte *Finn*, 32 Ore. 519; *In the matter of Chandler*, 105 Mich. 235; *In the Matter of an Attorney*, 83 N. Y. 164.

In the practice prescribed by our statutes for the disbarment of attorneys, it is provided: "When the matter charged is not indictable, the trial of the facts alleged shall be had in the court in which the charges are pending, which trial shall be by jury, or, if the accused fails to appear, or, appearing, does not require a jury, by the court." Kirby's Digest, § 460. But in the trial of all cases civil in their nature, it is the province of the court to direct a verdict where the evidence is uncontroverted. And so, in this character of proceeding, the court has the power to direct the return of a specific verdict, even if a jury had been impaneled to try the charges made against the attorney, in the event the evidence adduced upon such trial is uncontroverted.

In the present proceeding, the court heard the case upon the facts set out in the defendant's sworn answer, and therefore admitted by him, and the record of cases in said court whose verity could not be assailed. The evidence was therefore uncontroverted, and it became the province of the court, as well as its duty, to have directed a jury as to the verdict they should have returned, had the case been tried by a jury. If, therefore, the uncontroverted evidence adduced in this case sustains grounds for the disbarment of the defendant, he is not prejudiced, and can not complain because the court discharged the jury and proceeded, under such uncontroverted testimony, to make findings and render a judgment. The proceedings for the disbarment of attorneys are not formal. The prosecution thereof may be conducted in the name of the State by its prosecuting officer. (*Turner* v. *Commonwealth, supra*); or the court may require a member of the bar to present and prosecute the charges (*State* v. *Harber, supra*). After due and proper notice

has been given to the defendant of the charges preferred against him, the court has the power to proceed with the trial of the matter according to the rules of practice adopted by it not contrary to any procedure prescribed by statute. Where there is a conflict in the evidence adduced relative to the charges preferred, we are of the opinion that, by the above section 460 of Kirby's Digest, the defendant is entitled to a trial thereof by a jury; but he is deprived of no right of which he can complain where the case is tried by the court without a jury when the evidence adduced upon the trial thereof is uncontroverted. *Beene* v. *State*, 22 Ark. 149.

The next question to be considered is whether or not the facts proved and admitted constitute a legitimate ground for striking the name of the defendant from the roll of attorneys of the Pulaski Circuit Court.

It is well settled that the power of removal from the bar is possessed by all courts which have authority to admit attorneys to practice. Any attorney may forfeit the license which he has obtained by abusing it, and the power to exact such forfeiture rests with the court which grants it. It is settled that the power to strike from the rolls the name of such an attorney is inherent in the court itself, and is indispensable to protect the courts in their dignity and the public in the proper administration of the law, as well as in maintaining the honor and purity of the profession. Weeks on Attorneys at Law, § 80; *Beene* v. *State, supra;* Ex parte *Burr,* 9 Wheat. 529; *Bradley* v. *Fisher,* 13 Wall. 355; Ex parte *Robinson,* 19 Wall. 505; In re *Philbrook,* 105 Cal. 471; *Boston Bar Association* v. *Greenhood,* 168 Mass. 169; 3 Am. & Eng. Law. 300; 4 Cyc. 905.

Such power should be exercised with caution, and only for reasons which would render the continuance of the attorney in practice inimical to the just and proper administration of justice, or subversive of the integrity and honor of the profession. Ex parte *Burr, supra.*

Conduct of an attorney in the performance of his duties as such is especially subject to the supervision of the courts in which he exercises that profession. They may compel him to act honestly with his clients and honestly in his practices with the courts. He may be removed for malpractice and for dishonesty in his profession. This malpractice and dishonesty

may consist of the perversion and abuse of the processes of the court to obtain an unwarranted and unjust action. If, by any act of commission or omission, he deceives the court so that he obstructs or pollutes the administration of justice, or by the suppression of truth obtains a result which the law would not warrant, he is guilty of malpractice and renders himself unworthy of the privileges which his license and the law confers upon him. If an attorney is guilty of unprofessional conduct, he is subject to suspension or disbarment by the court, according to the degree of the moral turpitude evinced by such unprofessional conduct. It has been held that this professional misconduct may consist "in betraying the confidence of a client, in attempting by any means to practice a fraud, impose upon or deceive the court, the adverse party or his counsel, tampering with or suborning witnesses, fraudulently inducing them to absent themselves and avoid attendance upon court when it is suspected or known that their testimony will or may be prejudicial to him or his client; and, in fact, any conduct which tends to bring reproach upon the legal profession or to alienate the favorable opinion which the public should entertain concerning it." Ex parte *Ditchburn,* 32 Ore. 538; In re *Serfass,* 116 Pa. St. 455; *O'Connell,* Petitioner 174 Mass. 253; *Penobscot Bar* v. *Kimball,* 64 Me. 140; In re *Weed,* 26 Mont. 507; note to In re *Philbrook,* 45 Am. Stat. Rep. 59.

In the case at bar the defendant conceived the plan of forcing the compromise or collection of notes or small claims against persons resident in counties throughout the State by the use of the process of the court in a manner that is claimed to have been an abuse thereof. These notes were given for premiums for future insurance which failed by reason of the insolvency of the insurance companies, and on this account there was no valid consideration for these notes. He combined with a resident of Pulaski County in the purchase of these small claims, which were sold under circumstances which indicated that they were practically worthless, and their legality doubtful. It is the policy and spirit of our law, enacted into statute by our Legislature, that every defendant shall be sued in the township or county of his residence. To this general principle there are statutory exceptions, chiefly in cases where there is a joint liability against two or more defendants residing

in different counties. In such cases it is provided that suits may be brought in the county of the residence of any of the defendants, and service of summons can then be had upon the other defendants in any county, thereby giving jurisdiction over their persons to the court wherein the suit is thus instituted. Kirby's Digest, §§ 6072 and 4558. But, before this jurisdiction can be acquired by virtue of these statutes over the person of such defendants nonresident of the county wherein the suit is instituted, it is essential that the defendant resident of the county where the suit is brought shall be a *bona fide* defendant. By our statute, it is further provided that, before judgment can be had against such nonresident defendants, a judgment must be obtained against the resident defendant. Kirby's Digest, § 6074.

If the transaction is colorable and collusive, and the resident person not a defendant in fact and in good faith, then service of process of summons upon him would be incapable of laying the foundation for jurisdiction of the court over nonresident defendants served with summons in other counties. Upon such facts being made known to the court, it would be its duty to quash the service of summons upon such nonresident defendants. Such defendants can not be dragged from the forum of their residence by any sham or contrivance to evade suit against them in a court in the county where they reside. Such a perversion of the court's process is a fraud practiced upon the court, which should receive its condemnation upon being made aware of it.

In the case of *Capital City Bank* v. *Knox*, 47 Mo. 833, the court expressed the view to take of such practice in the following language: "The demurrer confesses that the indorsement and transfer of the note by Vose to the plaintiff was a sham, for the sole purpose and object of enabling the Cole County Circuit Court to acquire jurisdiction over Knox, and compel him to answer and litigate the case in a county remote from his residence. Such a proceeding the law ought not to sanction. It would be productive of great injustice. The result would be, by a combination of parties for sinister ends, to abuse the process of the courts, and drag a defendant from one end of the State to the other to defend his rights at great trouble or expense, or else submit to be victimized." *Eames* v. *Carlisle*, 3 N. H.

130; *Parson* v. *Brown,* 50 N. H. 484; *Day* v. *Jackson,* 5 Mass. 237; *Dean* v. *Hewit,* 5 Wend. 261; *Maxfield's Lessee* v. *Levy,* 4 Dall. 330; *Jones* v. *League,* 18 How. 77.

It has been settled by the decisions of this court "that where a debtor and creditor are residents of the same State an attempt of the latter to evade the exemption laws of the State of their domicile by bringing suit in another State," although apparently legal in form, is an abuse of process justifying the restraining power of a court of chancery. *Greer* v. *Strozier,* 90 Ark. 158; *Greer* v. *Cook,* 88 Ark. 93; *Griffith* v. *Langsdale,* 53 Ark. 71.

Knowing that under our statutes a defendant must be sued in the county or township of his residence, Wernimont, in order to evade these plain provisions, conceived the plan of having a resident of Pulaski County indorse the notes so that he apparently would be jointly liable upon them, and thus could be sued as one of the defendants. By this method he obtained the issuance of summons against defendants residing remote from the county where the suits were brought, and obtained for the court issuing such process apparently legal jurisdiction over such defendants. If, as a matter of fact, such resident defendant was not in truth a *bona fide* defendant, and so known to Wernimont who secured the issuance of such process, then he was guilty of practicing a fraud upon the court and subverting the proper administration of the laws. This was the more reprehensible because it was not done in one case, but in hundreds of cases. That the indorsement of the notes by Miller, and the transfer by him to the company of which plaintiff was the moving spirit, was only colorable and collusive, we think, is well established by the defendant himself. In his sworn answer, he says that the purpose of thus making the transfer of the notes and obtaining the guaranty thereof by Miller was to give to the courts of the county where Miller was a resident jurisdiction over the makers of the notes, who were nonresidents of such county. It is true that Wernimont also says that such transfers and guaranty by Miller were made in good faith, but it is inconceivable that it could be thought that the transaction was made in good faith when thereby Miller, who had only paid a small sum for these notes and who had only obtained a few hundred dollars therefor, guarantied

the payment of all these notes and thus became absolutely liable for their face value, which amounted to almost $15,000, exclusive of interest, and when at the same time both he and Wernimont knew that the collection of any of these notes from the makers thereof was extremely doubtful. Besides, it is also stated by him that Miller was to receive 20 per cent. of the very notes whose payment in full he thus absolutely guarantied, and an additional sum of 25 per cent. if he himself collected them. Collected them from whom? He was equally liable to Wernimont with the makers thereof by his indorsement and guaranty; and if the transaction was *bona fide,* Wernimont's company was not required to go to the trouble or expense of seeking the makers, but could collect these notes direct from Miller. It is plain that the transfer and guaranty by Miller was a subterfuge, concocted for the purpose of imposing on the court's process and practice under the statute, in order to secure jurisdiction over persons nonresident of the county where the suit was brought, and attempting by this abuse of the court's process, to extract from such nonresident persons compromises or judgments by default.

The presentation of these facts to the court would have resulted in quashing the service of such process and a deprivation of jurisdiction of such court over such nonresidents. By suppressing these facts, which he knew, Wernimont practiced a fraud upon the court in obtaining the issuance of these summonses and in endeavoring to secure judgments based thereon.

It is urged that Wernimont did not act in bad faith with the court because he thought he had the right to make the transaction and to adopt a practice for service of summons upon defendants nonresident of the county authorized by statute. But his action could not have been done in good faith, because the transaction with Miller is plainly colorable and collusive. His subsequent action in taking nonsuits in the circuit court, when the nonresidents prosecuted appeals from the judgments obtained before the justice of the peace evinced that he knew that he was committing an imposition upon the court. The number of the suits thus brought, and the continuance of the practice, indicate a total disregard of his duty as an attorney and officer of the court to uphold and maintain the proper administration of justice.

The lower court found that he was guilty of such malpractice by his perversion and abuse of the court's process that he was not a fit person to continue the practice of law in that court, and therefore ordered his removal; and we are of the opinion that the uncontroverted testimony stains the finding and action of the court.

The judgment is accordingly affirmed.