STATE BOARD OF LAW EXAMINERS,

*Complainant,*

vs.

ERNEST JOHN GOPPERT,

*Respondent.*

(No. 2434; April 20th, 1949; 205 Pac. (2d) 124)

118

For the complainant the cause was submitted upon the briefs of Norman B. Gray, Attorney General of Cheyenne, Wyoming, and James L. Simonton, County and Prosecuting Attorney of Park County, Cody, Wyoming, and oral argument by Mr. Gray.

For the respondent the cause was submitted upon the brief of J. D. Fitzstephens of Cody, Wyoming, Harry S. Harnsberger of Lander, Wyoming, and Jerry W. Housel of Cody, Wyoming, and oral argument by Mr. Fitzstephens and Mr. Harnsberger.

## OPINION

BLUME, Justice.

This is a proceeding brought in Park County, Wyoming, by the State Board of Law Examiners, hereinafter referred to as the Board, to suspend, disbar or otherwise discipline Ernest J. Goppert, an attorney at law, residing at Cody, Park County, Wyoming, hereinafter referred to as the respondent, on account of certain professional misconduct on his part as alleged in the petition herein filed, and some of which will be specifically mentioned and discussed hereafter. The respondent filed an answer, in substance denying any and all professional misconduct and explaining his actions in connection with the matters set forth in the petition in all instances in which he deemed an explanation proper or necessary.

The case was heard by three District Judges as provided by Section 2-118 Wyo. Comp. St. 1945. These judges, while condemning some of the practices of the respondent, as hereinafter mentioned, recommended to this court that the charges against the respondent be dismissed and that he go hence without day. The Attorney General, representing the Board has filed objections to nearly all of the findings and conclusions of the trial judges, on the ground that they are not

supported by the evidence, are contrary to the evidence and contrary to law.

Counsel for the respondent argue that the attorney general had no right to file objections on the ground that there is no provision in the rules of this court permitting such objections to be filed. Section 2-121, Wyo. Comp. St. 1945, provides: "There shall be a hearing before the Supreme Court upon the record certified by the district court, under such rules of procedure as said Supreme Court may prescribe. The Supreme Court shall render such judgment as the facts warrant, etc." Rule 39 of this court (Section 1-439, Wyo. Comp. St. 1945) provides that upon the filing of the record in disbarment proceedings, the clerk shall notify the accused attorney of the filing of the record. Rule 40 of this court (Section 1-440, Wyo. Comp. St. 1945) provides that the accused attorney may file his objections to the findings and recommendations of the judge or judges within 30 days after the mailing of the notice provided in Rule 39. But no specific rule has heretofore been adopted providing for the filing of objections on the part of the Board. Since this court, however, is, under the Statute made the final arbiter as to the proper professional conduct of the members of the Bar of this state, we do not think that the absence of a specific rule heretofore adopted should prevent this court from reviewing the record and render such judgment as the facts warrant, for this court should not nullify the provisions of Section 2-121 supra. In the absence of a specific rule, the matter must be governed by a special order of the court, as was done in this case. It has been held under statutes providing for disbarment, that though no specific provision had been made therein for appeals by a prosecuting board or committee, an appeal should, nevertheless, be allowed. See Grievance Committee vs. Broder, 112 Conn. 263, 269, 152 A. 292; State vs. Kaufman, 202 Ia. 157, 209 N. W.

417; State ex rel. vs. Huddleston, 173 Ark. 686, 293 S. W. 353; In re Chappell, (OhioApp.), 33 N. E. (2d) 393; 7 C. J. S. 800. In the first of these cases above cited, the court stated: "It would be incongruous for the judges of the superior court and the Legislature to provide the special procedure for the investigation and prosecution of such complaints with intent to protect the court, the profession of the law, and the public, and then deny the right of appeal from the decision of the trial court when the public official authorized by the judges of the superior court to prosecute the complaint was of the opinion that the decision of the trial court did not accord with the law. Neither Legislature nor judges can be charged with the institution of such a halfway measure of justice. When they approved of a procedure calling for the investigation and prosecution of such complaints, they intended that these should be carried through under the forms and rulings of our law to an ultimate determination. In no other way in these matters can justice be served."

We have read the evidence in the case. The legal principles applicable herein are few and so far as we can perceive, the questions involved are in the main questions of fact. We accept the findings of fact by the trial judges just as we accept the findings of a jury, or those of the trial court without a jury, in other cases. State Board of Law Examiners v. Phelan, 43 Wyo. 481; 5 Pac. (2d) 263; State Board of Law Examiners v. Strahan, 44 Wyo. 156; 8 Pac. (2d) 1091. Hence, we should perhaps omit a discussion of the facts altogether. But we are faced with a brief of 92 pages of the Attorney General, dissenting from the findings of the trial judges as already mentioned on nearly all points, and since the case is perhaps in part of general interest to the Bar of the State, we have been reluctant not to discuss the main charges herein to some extent and we shall do so as briefly as possible.

Some of them relate to respondent's alleged professional misconduct in connection with the receivership hereinafter mentioned. In order to understand them, it is necessary to consider the underlying facts in connection therewith. These are substantially as follows:

In March, 1938, and for time prior thereto, John G. Schepers and Minnie Chatterton, as co-partners, were conducting a business at Basin, Powell and Riverton, consisting of the operation of bean warehouses, the processing and marketing of beans, and the sale of seed and feed at retail. The plant at Riverton was small. A number of buildings and warehouses of the partnership were located at each of these places, except that only one building was owned by the partnership at Riverton, Wyoming. In 1937, some 123 bean growers had delivered to the partnership for processing and storage in its warehouses beans of the value of from $26,000 to $28,000. The beans were stored subject to the further order of the growers and the partnership had no right or title thereto. Notwithstanding that, the partnership shipped the beans to a public warehouse in Kansas City, Missouri, receiving warehouse receipts, pledged these receipts to Seavy and Florsheim Brokerage Company of Kansas City, Missouri, thus converting the beans to its own use. About the 17th of March, 1938, the partnership felt that it was unable to continue business unless it was able to raise some money to continue it. A. E. Schepers, apparently some relative of John G. Schepers, who appears to have been in active charge of the partnership business, called on the respondent herein to accompany him and others to Kansas City to see if it would not be possible to raise some $15,000 to $25,000 to put into the partnership business in order that it might continue. The money could not be raised, and upon the return of the parties to this state, an application was made to the court by John G. Schepers to have a receiver appointed for the partner-

ship. Consent to that was given by Minnie Chatterton, and L. L. Breining was appointed receiver with the right to keep the partnership a going concern. The respondent was appointed the attorney of the receiver a few days subsequently. Notice to creditors was duly given. The property was appraised on July 28, 1938. The Powell plant was appraised at about $21,000; the Basin plant at about $24,000, and the Riverton plant at about $3,000, a total of approximately $48,000. The building belonging to the Riverton plant was sold at the approximate appraised value and that plant will be disregarded in the future discussion herein. On July 26, 1938, the receiver filed a petition in court alleging that it would be impossible to operate the business with profit in order to pay the creditors of the partnership within a reasonable time and asking that the court make an order for the sale of the property. The court entered an order setting the hearing on the petition for August 11, 1938. An order was duly entered for the sale of the property, and Judge Metz, Judge of the Fifth Judicial District, called upon the bean growers in his district interested in the partnership to appoint a committee for the purpose of passing upon whatever bids might be received for the property. Notice of the hearing upon the petition for sale of the property and asking for sealed bids was published in a paper published in Basin, Powell and Riverton. The court authorized the sale of the property at not less than two-thirds of the appraised value. In the meantime and subsequently, the receiver corresponded with various bean companies and bean operators in the United States. He testified that he made 30 to 40 contacts and had correspondence with every bean operator in the United States from coast to coast. The correspondence of the receiver with these various parties in the United States is in the record. He sent a detailed description of the property owned by the defunct partnership to the part-

ies who might be interested. The correspondence with various parties lasted up to March, 1939. Employees of the receiver, too, made efforts to sell the property as advantageously as possible to creditors. On August 11, 1938, A. E. Schepers submitted a bid for the Powell plant at the sum of $11,400, but that bid was conditional and was rejected. On September 24, 1938, one A. E. Beaver bid $7,500 for the Powell plant, but this bid, too, was rejected. No bids were received for the Basin plant, and while various parties in their communications to Breining seemed to manifest an interest in connection with the property, no bid of any kind was received from them, other than above mentioned. So, for several months prior to March 18, 1939, the respondent herein attempted to get some associates of his in other business and friends to buy property. He testified that "he coaxed them to bid on the property." One of them, Colonel Melton, after considering the matter, refused to become a party to the purchase. He finally interested Ernest F. Shaw, Thomas O. Cowgill, Howard F. Bell and Harry C. Sanderson, and Frank C. Hockensmith, a bean operator of Denver, to make a bid on the property. Shaw, Bell and Sanderson met Hockensmith in Basin on March 17, 1939, to inspect and examine the property to determine what bid to make for it. The respondent and the receiver of the property accompanied them. They first inspected the property at Basin, then proceeded to inspect the property at Powell, and met on the evening of March 17, 1939, at the office of the respondent herein to determine finally what bid to make for it. Thomas O. Cowgill does not appear to have been present at that meeting. The respondent expected the parties to make a bid of $20,000 plus about $7,500 for personal property on hand, making it a total of $27,500. That appears in a letter written by the respondent on March 11, 1939, to Alton Gumbiner of Kansas City, Missouri, in which

he stated that the receiver had been offered the sum of $27,500. When the parties met as above mentioned in the office of the respondent, Hockensmith objected to making an offer of $27,500, stating that the plants were not worth any more than $20,000 and that if they (the parties in the meeting) could not and would not agree on making a bid of $20,000, he would have nothing to do with it. At that time,, as testified by the receiver Breining, the respondent stated that: "I am satisfied that the court will not approve such a low bid." However, after discussion, the parties above mentioned entered into a partnership agreement, dated the 18th day of March, 1939, for the purpose of buying the Schepers-Chatterton interests at Powell and Basin and directed Ernest F. Shaw to make a bid for the property, aside from notes and accounts, for the sum of $20,000, accompanied by a check of $2,000. That bid was ultimately, and after re-appraisement accepted and the property sold to Ernest F. Shaw for the benefit of the partnership formed by himself and others. Judge P. W. Metz, Judge of the Fifth Judicial District, was a witness in this proceeding. He stated that he appointed committees from among the bean growers. He testified in part as follows: "Not long after that, I was advised there had been an election had of the bean growers and each community had elected an advisory committee. The more I became acquainted with the matter, the more I became nervous about it. I felt that it was a precarious business; that it was a speculative business and the court shouldn't be carrying on any such type of business any longer than necessary. So I called on the attorney and the receiver to get busy to get someone to buy the property. Creditors began to show up to get possession of machinery at Powell and Basin and Riverton, machinery which had been sold under conditional sales contracts. * * * Breining advised me he contacted all of the bean mills, people

in Denver and Kansas City; that Florsheim had come out and looked over the spread and appeared ready to advance money when his sons broke up the deal. * * * I got a bid from Orie for $7500, in which he offered to buy the Powell plant along with a long list of machinery, and on the day I received it or the next day, I got a phone call from him saying for me not to act on the bid. He stated: 'It isn't worth that much money. I can't do it. I can't afford it.' * * * So along came this bid from Shaw for $20,000 cash. At that time, I knew that these men were some of Goppert's friends at Cody. He told me it was a group of associates of Ernest Shaw. * * * I think you will find that the beangrowers' committees approved that sale for $20,000. * * * I appointed appraisers in whom I had confidence. I conferred with the bean growers. I even asked a few men if they would be interested. Those 2-cent beans made it absolutely impossible to get anybody to put up a bid of any size, comparatively, because of the price of beans. Beans today are 10 and 12 cents, then they were 2 cents, and of course there wasn't anybody making any money then to operate. The farmers were hard up, the firms weren't interested because I contacted two of them myself. * * * Shaw was the only one that ever come up with a bid anything like that size and it was a last resort, after a year of running that bean business, and the court approved it because I felt, first, that it was the highest bid that could be received from anybody and because the bean growers' committees approved it also. * * * I had stuck out for $25,000 or thereabouts for a year because I was trying to see that the bean growers got their money or their preferred claims, but I was thoroughly convinced at the time of the sale that there couldn't be any more money received for those plants, and that is why I approved it."

I. The interest of Thomas O. Cowgill above mentioned was assigned to Estelle Goppert, wife of the defendant. It is charged by the Board that this interest was in fact acquired by the respondent through his wife at the time of the sale of the main property of the receivership to Ernest Shaw; in other words, that the respondent was one of the partners and associates of Shaw in purchasing the property, and that Cowgill was a mere dummy. The trial judges made no specific finding on this point. They contented themselves with finding "that the sale of the receivership property was fairly conducted and the highest price reasonably obtainable was obtained therefor." In view of the fact that it is contended in the brief of the Attorney General that respondent's action was presumptively fraudulent, and great stress is laid thereon, we have deemed it best to consider the testimony on that point to some extent, considering, in the main, the points which we deem of importance. There is no direct evidence to sustain the charge made by the Board. Cowgill was its witness. If we read the record correctly, he was not particularly friendly to respondent at the time of the hearing herein, although he and the respondent were friends in 1938 and 1939 and for some years thereafter. Cowgill's testimony and the respondent's differ to some extent, which, after the expiration of nine years, is perhaps not remarkable. The respondent testified that his wife acquired the interest mentioned in 1941 although the assignment was dated back to June 30, 1939; that Cowgill had signed a note to Mrs. Goppert, which, when the assignment was made, was returned to Cowgill. That the assignment was made in 1941 is to some extent corroborated by the testimony of Howard F. Bell. Cowgill testified that he did not remember of having given any note or that any note was returned to him, and indicated that the assignment to Mrs. Goppert was in fact made about June 30, 1939. A great deal of

the argument of the Attorney General is devoted to the difference in these dates, but that difference is not important if, as a matter of fact, the purchase by Mrs. Goppert was not made at the time when Shaw and his associates acquired the property. There seems to be no doubt that Cowgill, apparently a conservative business man, was reluctant to purchase an interest in the receivership property and expected the respondent to find a party for his interest should he himself finally decline to retain it. He was not present at the meeting of March 17, 1939, but he signed the partnership agreement with Shaw and his associates on the morning of March 18, 1939. His testimony is in part as follows: "Q. Would you tell us at this time, Mr. Cowgill, whether or not, at the time you signed that instrument, (the partnership agreement with Shaw and others) you did that in good faith? A. I did. Q. And you understood that by signing the agreement you were committing yourself to the contribution called for by the document? A. That's right." He further testified that he signed a check for $18,000 on behalf of Ernest Shaw for the balance of the purchase price of the property of the receivership; that he wired Shaw, who was then in California, that his offer had been accepted, and that he received from the respondent herein a letter dated April 1, 1939, addressed to him and the other associates of Shaw above mentioned, stating in effect that the Shaw bid of $20,000 had been approved. If Cowgill's testimony is taken at its face value, he, and not Mrs. Goppert, purchased an interest in the receivership property, although it is true that he was reluctant to do so. The Board, in its brief, fails to mention or explain the testimony here set out. Its argument is, in the main, directed to prove this testimony of its own witness to be false. It points out various circumstances to show the falsity thereof. One is that respondent "authored" the partnership agreement of

Shaw and associates. We fail to see the force of that. Respondent had coaxed Shaw and others to buy the property in question. That he participated in the drawing of the partnership agreement was but a natural consequence thereof. There was nothing wrong in it if it was all right to persuade the parties to buy the property. It is not suggested that that was wrong. An attorney at law with some business sense, who is worth his salt and is not bent merely on drawing his fee, would, under the circumstances here disclosed, do likewise, provided, of course, that he conscientiously believed that the parties who would buy would not be defrauded. Again, it is pointed out that the partnership agreement between Shaw and others provided for an undisclosed partnership, and the conclusion is drawn that provision was inserted so as to conceal the fact that the respondent had any interest therein. The latter testified that the agreement in that connection came about by reason of the fact that Hockensmith of Denver did not want his interest in the partnership disclosed. There is no particular reason why the agreement should have been changed later after Hockensmith parted with this interest. There are many undisclosed partnerships, so organized for many different reasons, that we should hardly venture to say that that is a circumstance showing that respondent was one of the purchasers from the receivership. Another circumstance mentioned by the Attorney General is the fact that, in 1946 to 1947, Shaw and each of his partners made a large profit out of the bean business. The testimony shows that the venture lost money until the war—in fact, $6500, the first 14 months—but that it began to make money after the beginning of the war. It is hardly fair to judge the business conditions of 1938 to 1939 which, as the evidence shows, were poor, by the conditions of 1946 to 1947, when, as we

all know, agricultural interests were exceedingly prosperous as a result of the war.

There are circumstances shown in the record which indicate the good faith of respondent in his relations with the receivership. He wrote a letter to the receiver on August 2, 1938, shortly before bids for the receivership property were to be received. He stated in part: "I do hope we can get some real bids at this opening. If we could sell the whole spread, lock, stock and barrel, it would certainly be a ten-strike, particularly if we could get enough out of it so as to pay the creditors any way near in full." It would seem that at that time in any event, he had no thought of acquiring an interest in the receivership property. Again, on March 11, 1939, he wrote to Mr. Gumbiner that there would be an offer of $27,500 for the receivership property. He expressed his disappointment when Hockensmith refused to give more than $20,000. While these matters might be construed as self-serving facts, they also may be construed as showing his good faith in working for the benefit of those interested in the receivership and not for his own benefit. One cannot help but wonder, in reading the record, in this case, how, or at what price, sale of the receivership property could ever have been effected had it not been for the efforts of the respondent in getting his friends interested. The reluctance and caution of an apparently hard-headed business man like Thomas O. Cowgill, the refusal of Col. Melton to buy an interest, the reluctance of Hockensmith, who within less than a year severed his connection with Shaw and his associates, the absence of any substantial bidders for the receivership property during the course of a year, cannot help but make one curious to know how the respondent, a man probably with no greater vision into the unknown future than anyone else, can, with any degree of fairness, be said to have schemed to acquire an interest in a bankrupt bean business. The

court, in the case of In re Chappell (Ohio App.), 33 N. E. (2d) 393, 397, said: "The evidence must be clear and convincing, that is to say, that degree of proof which will produce in the mind of the court a firm belief or conviction of the truth of the charges and specifications sought to be established." Taking all the facts and circumstances into consideration, it is difficult to see how this court could say that the Board has met the burden of proving the respondent guilty of unprofessional conduct in the matters above mentioned, particularly in view of the recommendation of the trial judges who saw and observed the witnesses and determined their credibility.

II. Among the property of the receivership were notes and accounts receivable. Aside from those listed as worthless in the appraisement, the accounts and notes connected with the Riverton plant were appraised at $1817.81; those connected with the Powell plant at $3396.19; those connected with the Basin plant at $1722.11; a total of $6936.11. After the sale of the main property, there remained notes and accounts of the face value of $2313.61. These were sold at 10 per cent of the face value thereof to the Cody Finance Company, a partnership of which Thomas O. Cowgill was manager and in which Mrs. Goppert had an interest. The respondent is charged with not having made proper effort to collect them and with having acquired an interest in them (through his wife), making a substantial profit, knowing that a large part therof was recoverable. We shall not spend much time in connection with the effort made by respondent to collect the accounts or notes or as to the collectibility thereof. That was a question of fact. We might, however, say that the testimony shows that a good deal of effort was exerted to collect them. For instance, respondent and the receiver, in January and February, 1940, spent ten days personally calling on the debtors, taking chickens,

turkeys, eggs, grain, or anything else they could get in satisfaction. It is not altogether clear what amount of ultimate profit was which was made by the purchaser of the remaining notes and accounts. Cowgill testified that he made profit of $500, but that may refer to only a portion. A good part of the profits were not collected until 1943 and thereafter when insolvent farmers had, by reason of the war, become solvent. Cowgill stated that "I took a wild chance on 10 per cent of them (the accounts and notes) being good," and that the offer made was a fair offer.

The receiver testified at length as to the effort made to sell the remaining accounts and notes. Judge Metz, too, testified on the subject. He himself made efforts to get offers, but failed. He told the receiver to see Cowgill who was a good collector, and finally approved the sale to him, though he knew that the respondent was interested in the Cody Finance Company, since there was nobody else who would buy them at 10 per cent.

The sum of the matter seems to be that the receiver and not respondent induced Cowgill to make an offer which at first was at 5 per cent and later at 10 per cent of the face value of the accounts and notes. Cowgill acted upon his own judgment, not upon the advice of, or after consultation with, the respondent. It would seem that if the latter should be censured, it would be because he did not insist that Cowgill's offer be rejected. The Attorney General makes no suggestions to that effect. We fully concur in the legal principles argued that an attorney at law must be faithful to his trust; that he must not act contrary to the interests of those whom he represents; that he must not, at least generally, buy or acquire an interest in his client's property when sold at a judicial sale. However, the facts in each case must be considered and are controlling. As stated in 7 C. J. S. 961: "There are numer-

ous cases which appear to support the view that the rule against purchases by an attorney is not inexorable and that under proper circumstances such a purchase may be sustained where the attorney has not violated any confidence reposed in him nor breached his duty of fidelity." In the case at bar, respondent did not, as already mentioned, buy the notes and accounts above mentioned. He at most acquired an interest in them through his wife, by reason of the acts of another (Cowgill), and that with the knowledge of the court, as found by the trial judges herein. We are not prepared, under the facts herein, and against the view which the trial judges evidently took, to hold that respondent's action was contrary to his duty of fidelity as an attorney.

III. As hereinbefore mentioned, the property of the receivership was acquired in the name of Ernest F. Shaw, and he had some partners. The partnership was increased subsequently to the number of seven. According to the testimony of the respondent, Shaw directed the respondent to draw a bill of sale and a warranty deed, made out on printed forms, conveying the personal property and the real property, the name of the grantee to be inserted later. The instruments were probably dated on February 28, 1945, were signed by Ernest F. Shaw, were witnessed by Ruth Witherspoon and were acknowledged before the respondent. Subsequently, the partnership acquired some Lovell property and Ernest F. Shaw, about May 1946, executed another instrument conveying that property. It was witnessed by the respondent and acknowledged before John R. Shaw, who seems to be a son of Ernest F. Shaw, deceased. No grantee was named. The dates contained in these instruments were subsequently changed. Those acknowledged before the respondent contain the date of July 28, 1947. That acknowledged before John R. Shaw contains the date of August

14, 1947. Ernest F. Shaw died by drowning on August 21, 1947. It is contended by the Board that the changes made in the instruments were in fact made after his death; that he was not actually present at the dates mentioned in the instruments, and that respondent falsified his certificates of acknowledgment. The respondent testified that at or about the time when these instruments purport to have been executed, Shaw was in his office and wanted the dates changed and his wife, Effie Shaw, named as the grantee of the deeds and bill of sale; that Shaw acknowledged before him, the respondent, two of the instruments as so changed, and that then Shaw took them home with him. Mrs. Dodge, stenographer of respondent, testified that Mr. Shaw was in respondent's office practically every day during July and August; that respondent told her that Shaw wanted to make the documents more recent and stated: "You can fix the dates, erasing them the best way you can so as not to erase them too much," to insert the more recent dates as of the time when Shaw would be in the office; and that this was done in the latter part of July or the forepart of August, 1947.

While it is not clear, it is not unlikely that the changes in all the instruments were made on August 14, 1947. We judge that from the fact that in the acknowledgment of John R. Shaw showing the date of August 14, 1947, the "14th" is in writing and as a respondent testified, in the handwriting of Ernest F. Shaw. The other changes in that particular instrument were probably made under the immediate direction of Shaw himself. The testimony of witnesses and associates of Shaw shows that he wanted to transfer his interest in the property of the bean business to his wife in July, 1947; the witness Metzler, testified that Shaw stated in August, 1947, before his death, that he, Shaw, had done so. No objection to such transfer seems to have been offer-

ed by any of Shaw's associates. The trial judges on this matter made the following finding:

"We find, as to the Shaw Bill of Sale and Deed, the alterations were made under respondent's direction, but were made with the consent of Shaw and before delivery thereof. We further find that the acknowledgment dates do not reflect the true dates of the acknowledgments and while we do not condone such conduct, we find that no fraud was committed thereby."

We see no reason for disagreeing with the trial judges. There was no possible motive why the respondent should have falsified his testimony in this connection. None has been pointed out. In fact, we are unable to conjecture any possible reason why respondent should have wanted to change the dates in the documents after the death of Shaw. He had nothing to gain thereby. Neither had anyone else. Mrs. Shaw was the sole beneficiary under Shaw's will. She made no claim to the property of the bean business to any greater extent than what her husband had. No one doubts or questions the fact that Shaw signed and acknowledged the instruments in 1945 and 1946, with the grantee not named. If respondent, with or without collusion with anyone, had desired for some unperceivable reason to have Mrs. Shaw named as grantee after the death of Shaw, all or substantially all, he would have needed to do would have been to insert her name and no one probably would have been the wiser; to have also changed the dates contained in the instruments would, it seems, have been utterly senseless.

There is perhaps one reason why Shaw himself in 1947 during his lifetime may have wanted to change the dates. That is at best, of course, only a surmise but we give it here: Judging from the testimony of Mrs. Shaw, her husband chafed under the heavy burden of federal taxation. He thought perhaps that he might lighten that burden by transferring part of his prop-

erty to his wife. Since the income from the property of the bean business had probably been reported in his own name for 1945 and 1946, he could not very well use a transfer made in 1945 or 1946, but felt that it was required to be made subsequent to those years. Hence, the changes in the dates. And we think that they were made at his request. So far as we can see, he had no intention to defraud his associates, even though a transfer purported to transfer the whole of the property, nor was he in position to do so since the interest in the bean business was determined by a partnership agreement. His transfer to his wife seems to have been satisfactory to his associates. The instruments in question were his; he seems to have had full control over them. If that is correct as it seems to be, it is difficult to see upon what ground we can say that it was either immoral or illegal for him to ask for or make a change in the dates and to re-acknowledge the execution before the respondent.

That is not to say that even in such case, let alone in others, we, any more than the trial judges, approve of the loose and careless method found by the trial judges to have been employed by respondent. To avoid making changes without too much multiplication of labor is, of course, frequently difficult. Initialing them has been found useful. We cannot, however, be expected to lay down any general rule to be followed in all cases, except to say this: Such changes in documents may lead to fraud; they are apt to expose the participants therein to the suspicion of dishonesty, as has been so strikingly exemplified in the case at Bar. Hence, they should be avoided as much as possible, by members of the Bar, if for no other reason than to maintain the dignity and good reputation of the profession. It is vitally important to all the members thereof that the conduct of an attorney at law, like that of Caesar's wife, should be above suspicion as nearly as that is

humanly possible. Without meaning to moralize, it should be considered true today, as it was in Shakespeare's time, particularly by members of the Bar, that:

"The purest treasure mortal times afford
Is—spotless reputation; that away,
Men are but gilded loam, or painted clay."

Richard II. Act I, SceneI.

IV. The respondent is charged with having forged a conveyance of real property and a bill of sale of personal property purporting to have been executed by one Chas. W. Taggart, and of having attached false certiflcates of acknowledgement thereto. That is a harsh charge to make against an attorney at law unless true. The Board had no witnesses to the forgery and falsity and depended almost solely upon the testimony of respondent himself and upon the appearance of the instruments which were introduced in evidence and are here before us. The fundamental facts are these: Taggart, an old friend and client of respondent, came to the office of respondent on or about February 28th or 29th, 1944. He was a very sick man, and was on his way to Oakland to seek medical aid. He died there about three weeks later. He was in a hurry and wanted to convey his interest in the Two-Dot Livestock Company to his wife, Jessie K. Taggart. At the suggesgestion of respondent, it was agreed that the latter should draw up a skeleton deed and bill of sale, complete in all its parts except the description of the property to be conveyed. This description was to be ascertained by respondent and was then to be inserted later. The property consisted of an interest in some 32,000 acres of land and personal property connected therewith. Instruments to the foregoing effect were drawn up, signed by Taggart, and acknowledged by him, although the formal certificate of acknowledgment was not then drafted on account of lack of time. Thus runs

the testimony of respondent. It is not disputed, but corroborated by Jessie K. Taggart who accompanied her husband to Oakland. She testified that after leaving Cody her husband told her that "He had seen Mr. Goppert and to make it easier in case he shouldn't come back * * * he had signed things over to me so that it would be easier in case he shouldn't come back."

Respondent further testified in substance, without going into too many details, as follows: A mishap occurred to the last sheet of these instruments which contained the signature of Chas. W. Taggart, in that his stenographer wrote an affidavit thereon instead of an acknowledgment, spoiling the sheet in respondent's opinion. He thereupon called up a Mr. Nielson in Oakland to get a new instrument, or part instrument, duly signed and acknowledged, but another mishap occurred, in that while a new instrument, or part instrument, was obtained, duly signed by Chas. W. Taggart, (which is corroborated by the wife and daughter of Taggart), it did not contain an executed certificate of acknowledgment. So, respondent concluded to use the signature obtained in his office, but, by a further mishap, his stenographer clipped and used on the final instrument assembled the signature obtained in Oakland instead of the signature obtained in respondent's office. He failed to notice this until the charges made herein were filed. All this is not quite as complicated as would appear upon first reading. Respondent's certificate of acknowledgment bears date March 1, 1944, and it is probable, judging from the testimony of Mrs. Taggart, that Chas. W. Taggart was in respondent's office on February 28, 1944, and not on March 1, 1944. This slight discrepancy in dates, however, while irregular, is not in itself of vital importance in the absence of intent to cheat and defraud. No fraud is shown by any evidence in this case. The trial judges made the following findings in this connection:

"We find that the manner of the preparation of the Taggart bill of sale and deed was generally as set forth in said charges, and, while we condemn such loose manner of the preparation of such instruments, we find that Taggart intended to convey the property therein described to his wife and actually signed said instruments, and we further find that no intent to deceive or defraud in connection therewith was practiced by respondent and the deed and bill of sale, as between the parties, was valid."

We find no reason for disagreeing with the findings of the trial judges. To designate the instruments in question as forgeries is not warranted. To constitute forgery, there must be (1) A false making or alteration of some instrument in writing; there must be (2) A fraudulent intent; (3) The instrument must be apparently capable of effecting a fraud. 37 C. J. S. 34. To say the least, the intent to defraud is wholly absent, nor do we think that any dishonesty on the part of respondent in this connection has been shown. On the contrary the fact alone that respondent called up Nielson in Oakland to have another instrument executed by Chas. W. Taggart appears to us as indicating that, despite the irregularities involved, he meant to proceed as an honest man would.

Disregarding the mishaps and irregularities herein mentioned, we should perhaps, before leaving the subject, go to the heart of the matter here involved and inquire as to whether or not an attorney at law, acting as a notary, is justified in drawing and having signed and acknowledged before him, a skeleton conveyance which, as here, does not contain a description of the property sought to be conveyed, and undertake to get such description and insert it in the document thereafter, as was intended to be done in this case. We find nothing about it in the Code of Ethics adopted by the American Bar Association nor has any rule of ethics in that connection been adopted by the Bar Association

of this state. In the absence thereof, we think that at least as a general rule, attorneys should abstain from pursuing the course pursued herein by the respondent, unless perchance they have indubitable authority, as for instance one in writing, to subsequently insert the description of the property. A course, such as pursued by the respondent herein, may open the way for the commission of fraud. It may easily give rise to suspicion of dishonesty as it did in this case. We repeat that this should be avoided as much as possible. We, therefore, join in the condemnation by the trial judges as above mentioned.

V.  Section 3-7302, Wyo. Comp. St. 1945, provides as follows: "No party, attorney or person interested in an action shall be appointed receiver therein except by consent of the parties, nor shall any party, attorney or person interested in an action be a representative of the receiver therein except by consent of the parties." It is argued that respondent was guilty of improper and unlawful conduct in accepting employment by the receiver, since the record shows that he acted for the partnership of Schepers and Chatterton and since it does not appear that he acted for the receiver "with the consent of the parties." The term "parties" as used in the statute probably includes creditors and all other parties interested in the receivership. It is difficult to see why respondent could be said to have been interested in any action contemplated by the foregoing statute by reason of the mere fact that he attempted to aid the foregoing partnership in raising some money in Kansas City. The fundamental thought underlying the statute in connection with the point here considered doubtless is that no one should act as attorney for the receiver who represents antagonistic interests unless by consent of the parties. That was the situation presented in Vieth v. Ress, 60 Neb. 52, 82 N. W. 116. We know of no antagonistic interests represented

by a respondent when he acted as attorney for the receiver herein. Moreover, it does not appear that anyone interested in the receivership ever made any objection. We held in the case of Stockmen's National Bank of Casper v. Calloway Shop, 41 Wyo. 232, 285 Pac. 146, that an objection to anyone thus acting contrary to the provisions of the foregoing statutes should be made seasonably and if not so made, the objection is waived. And if a waiver appears, as seems to be true here, it can hardly be said that a basis for suspension, disbarment or other disciplinary action exists.

Respondent was charged with several other acts of professional misconduct. Some of these are argued at length in the brief of the Attorney General. But they are not of special interest to the Bar. Since the trial judges found in favor of the respondent, we cannot see that any good purpose would be subserved by setting them out or by discussing them and thus extending this opinion to an undue length. Each case for disbarment or other disciplinary action must necessarily stand on its own footing and must be governed by the particular facts involved. We think that in this case the recommendations of the trial judges herein should be adopted and the charges against the respondent are dismissed.

RINER, C. J., and KIMBALL, J., concur.